# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

LAW OFFICES OF JEFFREY SHERBOW, PC v FIEGER & FIEGER, PC

Docket No. 159450. Argued January 6, 2021 (Calendar No. 1). Decided June 9, 2021.

The Law Offices of Jeffrey Sherbow, PC, brought an action in the Oakland Circuit Court against Fieger & Fieger, PC (the Fieger firm), asserting that the Fieger firm breached its referral-fee contract with plaintiff when the Fieger firm refused to pay plaintiff 20% of a contingent fee that the Fieger firm had received after it successfully represented several clients in a personal-injury and no-fault action related to an automobile accident in Ohio. Plaintiff alleged that Jeffrey Sherbow, an attorney and the sole proprietor of plaintiff, had referred the personal-injury and no-fault cases to Jeffrey Danzig, an attorney who at the time was a named partner at the Fieger firm. Plaintiff alleged that Danzig originally agreed to pay Sherbow $1/3$ of any contingent fee that the Fieger firm ultimately earned from the case. In 2011, Charles Rice (Rice) consulted with Sherbow regarding legal matters concerning Rice's nonprofit organization. On July 13, 2012, before their next scheduled meeting, Rice was killed in a car accident in Ohio. Mervie Rice (Mervie), Phillip Hill, and Dorothy Dixon (Rice's partner and the mother of his son, Dion Rice (Dion)) were also injured in the accident. On the day of the accident, Dion contacted Rice's organization, seeking Sherbow's contact information. A worker from the organization provided the information and then contacted Sherbow, informing him of the accident and that Dion wanted to speak with him. Sherbow then contacted Danzig at the Fieger firm to notify him of the potential case. Sherbow called Dion the following evening and then, over the following week, they spoke several times and met in person; Dion testified that he informed Sherbow that he intended to use the Fieger firm and had already contacted the firm. On July 26, 2012, Dion and Mervie met with Sherbow and Danzig at the Fieger firm's office; evidence presented at trial suggested that Mervie had also independently contacted the Fieger firm. During the meeting, Mervie signed a retainer agreement with the Fieger firm and Dion signed a similar agreement on behalf of his mother, who was in a coma at the time. The retainer agreements did not contain a referral-fee agreement between the Fieger firm and plaintiff. There was conflicting testimony as to whether Mervie and Dion were told that Sherbow would receive a referral fee with regard to the four accident victims: Sherbow and Danzig testified that Mervie and Dion were told about the referral fee, and Mervie and Dion testified that they could not recall referral fees being discussed. Danzig later went to Hill's apartment to meet with Hill and obtained a signed retainer agreement. The referral agreement itself consisted of three letters between Danzig and Sherbow, ultimately stating that Sherbow was entitled to 20% of the attorney fees. Sherbow did not meet with or have contact with Hill before the discovery in this case, did not meet or have contact with Mervie until the July 2012 meeting at the Fieger firm, and

did not speak with Dixon until Sherbow filed this action. In 2015, the Fieger firm won an award of $10,225,000 for the accident victims, with the contingent attorney fee totaling $3,408,333.34. Geoffrey Fieger refused Sherbow's request for his portion of the fee, explaining that while he had originally thought Sherbow referred the case, Fieger had subsequently learned that Mervie and Dion had contacted the firm on their own and that Hill and Dixon did not even know Sherbow. Sherbow filed this action, and the Fieger firm moved for partial summary disposition, arguing, in part, that the referral agreement violated MRPC 1.5(e). The court, James M. Alexander, J., denied the motion, concluding that Sherbow, as the referring attorney, was not required under MRPC 1.5(e) to have a written agreement with the client to split a fee and that the Fieger firm's claim that the agreement was against public policy was an affirmative defense for which the firm carried the burden. Despite that ruling, at the conclusion of the trial, the court instructed the jury that in order to recover fees for referring a client, Sherbow had to prove by a preponderance of the evidence that each of the four clients were Sherbow's clients. The jury found that only Dion, who was acting on behalf of Rice's estate, was Sherbow's client. Sherbow appealed in the Court of Appeals. In a published opinion, the Court, MURRAY, C.J., and SHAPIRO and RIORDAN, JJ., affirmed in part, reversed in part, vacated in part, and remanded for a new trial. 326 Mich App 684 (2019). The panel concluded that, contrary to the trial court's instruction, MRPC 1.5(e) did not require the referring attorney to have an attorney-client relationship with the client to recover a referral fee. The panel also concluded that the Fieger firm's public-policy argument was an affirmative defense, that the firm had the burden of providing supporting evidence, and that once evidence was introduced, Sherbow, as plaintiff, bore the burden of producing clear and decisive evidence to negate the defense. The panel ruled that the trial court erred by instructing the jury that Sherbow, as plaintiff, bore the burden of proof and that the errors below affected the outcome of the trial, requiring a new trial. Sherbow and the Fieger firm both applied for leave to appeal in the Supreme Court. The Supreme Court granted the Fieger firm's application for leave to appeal, 505 Mich 982 (2020), and held in abeyance Sherbow's application, 937 NW2d 694 (2020).

In a unanimous opinion by Justice VIVIANO, the Supreme Court *held*:

For a referral-fee agreement to be valid under MRPC 1.5(e), the referring attorney must have an attorney-client relationship with the individual he or she refers; the relationship can be limited to the act of advising the individual to seek the services of the other attorney if the referring attorney and client expressly or impliedly demonstrate their intent to enter into a professional relationship for that purpose. The burden of proving that MRPC 1.5(e) has been violated and that the referral-fee agreement is unenforceable falls on the party challenging the agreement.

1. MRPC 1.5(e) provides that lawyers who are not in the same firm may divide a fee only if (1) the client is advised of and does not object to the participation of all the lawyers involved and (2) the total fee is reasonable. With regard to referral fees between attorneys, the Michigan Supreme Court—from its adoption of the American Bar Association's 1928 amendment of its Canon of Ethics to its adoption of the ABA's Disciplinary Rule 2-107 in 1971—has historically required the referring attorney to have a professional relationship with the referred client. Specifically, fee-splitting was originally prohibited unless the referring attorney provided legal services in the case *or* assumed responsibility for the representation; later, under Disciplinary Rule 2-107, the referring attorney had to provide both legal services *and* assume responsibility for the representation. In 1988, MRPC 1.5(e) eliminated the services-and-responsibility requirement, thereby opening the door for pure referral fees. The interplay of MRPC 7.2 (banning lawyers from

giving anything of value to a person for recommending the lawyer's services) and MRPC 5.4 (prohibiting attorneys from sharing legal fees with nonlawyers except under certain circumstances) with MRPC 1.5(e) indicates that the latter is an exception to these general rules. It would be strange if this exception allowed lawyers to receive paid referrals and split fees simply based on an individual's status as a lawyer. This indicates that MRPC 1.5(e) requires the referring attorney to use his or her knowledge as an attorney, in some manner, on behalf of the client; in other words, as supported by the comments to MRPC 1.5(e) and the surrounding court rules, the referring attorney must participate in the matter as a lawyer by establishing a professional relationship with the client in order to share in fees. This is an agency relationship that develops from the parties' agreement, which can be express or implied through their conduct; therefore, an attorney-client relationship cannot exist unless the client seeks to obtain legal advice or services from an attorney either directly or indirectly through an intermediary. If the attorney and client expressly or impliedly intend to enter into a professional relationship, the referral can form the basis for that relationship, which need not extend beyond that referral. In this case, the trial court correctly instructed the jury that a professional relationship was required for the fee-split to be allowed under MRPC 1.5(e). The trial court's definition of "client" in the jury instruction was correct because it accurately required that a client employ a lawyer for professional advice or help.

2. A plaintiff has the burden of proof in persuading the jury of the elements of his or her case. In turn, a defendant bears the burden of production related to any affirmative defense raised. An affirmative defense does not challenge the merits of a plaintiff's claim but, instead, seeks to foreclose the plaintiff from continuing his or her case for reasons unrelated to the plaintiff's prima facie case. After the defendant presents evidence for an affirmative defense, the burden shifts to the plaintiff to produce sufficient evidence to overcome the defendants' evidence. Referral agreements are a proper subject matter for contracts; they are not illegal or improper. Under MCR 2.111(F)(3)(a) and (b), a defendant's claim that an otherwise valid contract is void because it violates the public policy underlying MRPC 1.5(e) is an affirmative defense; the public-policy argument does not attack the prima facie case related to breach of contract but, instead, offers an independent reason why the referral agreement is void and the contract claim should be defeated. In this case, the Fieger firm's argument that the referral agreement was void as against public policy was an affirmative defense for which it had the burden of proof. Accordingly, the trial court erred by instructing the jury that Sherbow, as the plaintiff, had the burden of proving that the agreement was not against public policy. Under the circumstances of this case, the error did not prejudice Sherbow as to Mervie and Hill, because there was no evidence from which a jury could have inferred that Sherbow had any contact or communication with either from which an attorney-client relationship could have arisen or that Sherbow referred them to the Fieger firm. However, Sherbow was prejudiced by the incorrect jury instruction as it related to Dixon. Although Sherbow did not speak with Dixon, there was evidence that her son Dion had acted on behalf of Dixon, just as he had acted on behalf of Rice's estate. Given this evidence and the fact that the jury found that Sherbow's interactions with Dion were enough to create an attorney-client relationship with Rice's estate, the Court could not say that a jury properly instructed on the burden of proof would have found that those same interactions with Dion were insufficient to establish an attorney-client relationship with Dixon. Remand for a new trial was warranted on Sherbow's claim regarding a referral fee for Dixon.

Court of Appeals judgment reversed in part and affirmed in part, jury verdict vacated with respect to Dixon, and case remanded to the trial court for a new trial regarding the portion of the fee Sherbow sought for referring Dixon.

# OPINION

Chief Justice:
    Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED  June 9, 2021

STATE OF MICHIGAN

SUPREME COURT

LAW OFFICES OF JEFFREY SHERBOW,
PC,

        Plaintiff-Appellee,

v                                                               No. 159450

FIEGER & FIEGER, PC, d/b/a FIEGER,
FIEGER, KENNEY & HARRINGTON, PC,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH

VIVIANO, J.

Michigan Rule of Professional Conduct 1.5(e) allows attorneys who are not in the

same firm to split attorney fees in certain circumstances. This often occurs when one

attorney refers an individual to another attorney for legal services but does not provide any

other legal services. The primary question in this case is whether, in order to enforce a fee-

splitting agreement, MRPC 1.5(e) requires the referring attorney to have an attorney-client

relationship with the individual he or she refers. We hold that it does but that the relationship can be limited to the act of advising the individual to seek the services of the other attorney if the referring attorney and client expressly or impliedly demonstrate their intent to enter into a professional relationship for this purpose. Consequently, we reverse the Court of Appeals' judgment to the extent that it held to the contrary. We agree with the Court of Appeals, however, that the defendant bears the burden of proving noncompliance with MRPC 1.5(e) when the defendant raises the violation of the rule as a defense against enforcement of the referral agreement. The result in this case is that the trial court properly instructed the jury that an attorney-client relationship was required but erroneously instructed the jury about the burden of proof. This error requires a new trial as to only one of the potential clients at issue, Dorothy Dixon.

## I. FACTS AND PROCEDURAL HISTORY

Jeffrey Sherbow was the sole proprietor of his law office, which is the plaintiff in this case. In 2011, he consulted with Charles Rice (Rice) on a few legal matters involving Rice's nonprofit organization. More meetings were scheduled for July 2012, but on July 13 of that year, Rice was killed in a car accident in Ohio. Also in the car were Mervie Rice (Mervie), Phillip Hill, and Dorothy Dixon, who was Rice's partner and the mother of his son, Dion Rice (Dion). These three injured parties plus Rice's estate are the four clients involved in the present case.

On the day of the accident, Dion called his father's organization and asked for Sherbow's contact information. Jennifer Hatchett, who worked for Rice's organization, provided the information and then called Sherbow to inform him about the accident and

2

that Dion was looking to speak with him. Sherbow spoke with Hatchett for about one minute, and Sherbow then called Jeffrey Danzig, a partner at defendant, Fieger & Fieger, PC (the Fieger Firm), and head of the Fieger Firm's intake department, to notify him about the potential case concerning the car accident. Sherbow and Dion did not speak until the following evening when Sherbow called Dion. Over the following week, Sherbow spoke with Dion a few times and they met in person. Dion testified that at the meeting, he told Sherbow that he intended to use the Fieger Firm and, in fact, had already called the Firm. Evidence also existed indicating that Mervie had contacted the Fieger Firm on her own.

At a meeting at the Fieger Firm's office on July 26, Sherbow and Danzig met with, among others, Dion and Mervie. Hill did not attend the meeting and neither did Dixon, who remained in a coma. Danzig and Sherbow both testified that Danzig explained that Sherbow would receive a referral fee with regard to the four clients and that no one objected. Mervie testified she did not recall any such explanation and that, although she did not object at the meeting, she would have if she had been told about the agreement. Dion testified that he could not remember if a referral fee was discussed at the meeting.

At the meeting, Mervie signed a retainer agreement with the Fieger Firm, as did Dion on behalf of Rice's estate. Dion also agreed to the Fieger Firm's representation of his mother, Dixon. Danzig later went to Hill's apartment and obtained a signed retainer agreement. Again, there was conflicting testimony about whether the referral fee was mentioned to Hill; Danzig said he explained it, and Hill denied hearing about it. For his part, Sherbow did not meet with or speak to Hill until the present case was in the discovery stage. Sherbow also acknowledged that he had not met or talked to Mervie until the July meeting. Dixon, after awakening from her coma, was informed by her son Dion that the

3

Fieger Firm had been retained. Danzig visited her and explained that the Fieger Firm was representing her—Danzig and Dixon disputed at trial whether he told her of the referral arrangement. Dixon did not speak to Sherbow until the present case arose.

Three letters between Danzig and Sherbow form the referral agreement. The first two letters confirm that Sherbow was entitled to one-third of the attorney fees; the last letter readjusted this down to 20% because the local counsel in Ohio (where the underlying case proceeded) wanted more than the 10% he had agreed to take. When Danzig left the firm in 2014, Sherbow confirmed the agreements with another Fieger Firm partner, Robert Giroux, who assured Sherbow that he would get paid.

Sherbow did no work on the case. In 2015, he learned that the Fieger Firm had prevailed in the underlying action, winning an award of $10,225,000, with the contingent fee totaling $3,408,333.34. Sherbow inquired about his portion of the fee, and Geoffrey Fieger (Fieger) responded that while he originally believed Sherbow had referred the case, Fieger had since learned that Mervie and Dion had contacted the office on their own and that Hill and Dixon did not even know Sherbow. Fieger indicated that the referral fee would not be paid. Later, Fieger obtained four identical affidavits from each of the clients attesting that Sherbow never represented them, that they did not want him to get a referral fee, that he did not work on the case, and that he did not refer them to the Fieger Firm.

Sherbow filed the present complaint in June 2015. In July 2016, the Fieger Firm sought partial summary disposition under MCR 2.116(C)(10), arguing among other things that the agreement violated MRPC 1.5(e). The trial court denied the motion, determining, in relevant part, that MRPC 1.5(e) did not require the referring attorney to have a written agreement with the client in order to split a fee and that the Fieger Firm's contention that

4

the agreement was void as against public policy was an affirmative defense on which the Fieger Firm carried the burden.

A trial was held in February and March 2017. Despite its earlier ruling to the contrary, the trial court instructed the jury—over Sherbow's objection—that Sherbow had to prove by a preponderance of the evidence that each client was Sherbow's client in order to recover a fee for referring that client. The trial court defined "client" as "a person or entity that employs a professional for advice or help in that professional's line of work, especially one in whose interest a lawyer acts as by giving advice, appearing in court or handling the matter." Question 1 on the jury verdict form asked whether a professional relationship existed. Question 2 stated, "If yes to any part of 1, did plaintiff refer one, some, or all or the following personal injury cases to Defendant?" The jury found that only Dion, on behalf of Rice's estate, was a client of Sherbow, who was awarded $93,333.33.

Sherbow appealed, contending among other things that the trial court erred by instructing the jury that the clients needed to have an attorney-client relationship with him in order for him to refer them and that the trial court erred by placing the burden of proving compliance with MRPC 1.5(e) on him. The Fieger Firm responded that the agreement violated MRPC 1.5(e) and, thus, was void as against public policy.

The Court of Appeals affirmed in part, reversed in part, vacated in part, and remanded.[1] The Court determined that the trial court erred in its jury instructions on MRPC 1.5(e), holding that contrary to the instructions given to the jury, that rule does not require

---

[1] *Law Offices of Jeffrey Sherbow, PC v Fieger & Fieger, PC*, 326 Mich App 684; 930 NW2d 416 (2019).

5

the referring attorney to have an attorney-client relationship with the client.[2]  With regard to the burden of proof, the Court of Appeals concluded that the public-policy argument constitutes an affirmative defense and, as such, the defendant bears the burden of providing supporting evidence.[3]  Once such evidence has been introduced, the burden shifts to the plaintiff to produce clear and decisive evidence negating the defense.[4]  Given that determination, the Court held that the trial court erred by instructing the jury that Sherbow, as plaintiff, bore the burden.  Finally, the Court concluded that these errors affected the outcome and therefore required retrial.[5]

Both parties sought leave to appeal in this Court.  We granted the Fieger Firm's application and have held Sherbow's in abeyance for resolution of the questions posed here, namely, whether MRPC 1.5(e) requires an attorney-client relationship, who has the burden of proving violations of that rule, and whether any errors below require reversal of the jury verdict.[6]

---

[2] *Id*. at 695-696, 708-709.

[3] *Id*. at 707-709.

[4] *Id*. at 708-709.

[5] *Id*. at 713-715, 718.

[6] *Law Offices of Jeffrey Sherbow, PC v Fieger & Fieger, PC*, 505 Mich 982 (2020); *Law Offices of Jeffrey Sherbow, PC v Fieger & Fieger, PC*, 937 NW2d 694 (Mich, 2020).

6

## II.  STANDARD OF REVIEW AND INTERPRETIVE PRINCIPLES

We review de novo the interpretation of the rules of professional conduct.[7]  When interpreting rules promulgated by this Court, such as the Michigan Rules of Professional Conduct, we are guided by the same principles that pertain to statutory interpretation.[8]  Accordingly, "we seek to discern the ordinary meaning of the language in the context of the [court rule] as a whole."[9]  Claims of instructional error are also reviewed de novo.[10]

## III.  ANALYSIS

Our analysis begins with MRPC 1.5(e), which we interpret to require an attorney-client relationship between a referring attorney and the individual the attorney refers.  We next explain that the party seeking to void a referral agreement on the basis that it violates MRPC 1.5(e) carries the burden of demonstrating the violation.  Finally, we determine that the trial court's error in instructing the jury that Sherbow bore the burden of proof requires a new trial only as to Sherbow's claim for referring Dixon.

## A.  MRPC 1.5(e)

MRPC 1.5(e) states:

> A division of a fee between lawyers who are not in the same firm may be made only if:

---

[7] *Grievance Administrator v Fieger*, 476 Mich 231, 240; 719 NW2d 123 (2006).

[8] See *Haliw v Sterling Heights*, 471 Mich 700, 704-705; 691 NW2d 753 (2005).

[9] *TOMRA of North America, Inc v Dep't of Treasury*, 505 Mich 333, 339; 952 NW2d 384 (2020).

[10] *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002).

>    (1) the client is advised of and does not object to the participation of all the lawyers involved; and

>    (2) the total fee is reasonable.

To understand what this rule means and whether it requires an attorney-client relationship, it is helpful first to trace the history of its language, which shows that we have long required the referring attorney to have a professional relationship with the referred client.[11]  The text and context of our current rule—examined after the history—demonstrate that we have not dispensed with the requirement of an attorney-client relationship in our current rule, even as we have dropped other requirements from the rule.

## 1.  HISTORY

The genesis of the rule can be found in a 1928 amendment to the Canon of Ethics adopted by the American Bar Association (ABA).  The amendment added Canon 34, which provided, in relevant part, that "[n]o division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility."[12]  A few years after it was promulgated by the ABA, this Court incorporated that language into our Rule 34.[13]  The ABA's ethics committee and commentators interpreted Canon 34 to "preclude

---

[11] Our focus is on the history of the text itself, and thus, we do not rely on materials or considerations analogous to legislative history.  Cf. *People v Pinkney*, 501 Mich 259, 276 n 41; 912 NW2d 535 (2018) (distinguishing legislative history from statutory history, the latter of which consists of "the narrative of the 'statutes repealed or amended by the statute under consideration' " and which "properly 'form[s] part of the context of the statute' ") (alteration in original), quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 256.

[12] *Canons of Professional & Judicial Ethics*, 51 Annu Rep ABA 767, 778-779 (1928).

[13] *Canons of Professional Ethics*, 15 Mich St B J 42, 54 (1936).

a division of fees among attorneys when one attorney provided no other service to the case beyond the referral itself."[14]  In 1937, our Committee on Professional and Judicial Ethics agreed, recognizing the position that " '[a]ll division of compensation between lawyers should be based upon the sharing of professional responsibility or service, and a division of fees merely because of the recommendation of another is not proper.' "[15]

The Canons, however, were aspirational and exhortatory standards, not rules that could be enforced through disciplinary proceedings.[16]  Perhaps as a result, violations of Canon 34 were rampant.[17]  In response, and as part of a general revision of the ethics code, the ABA constructed a tripartite system of ethical regulation, composed of general Canons,

---

[14] Billings, *What Attorneys Should Know: A Comprehensive Analysis of Proposed Rule 8A*, 35 St Mary's L J 1015, 1018 (2004); see also Drinker, *Legal Ethics* (NY: Columbia Univ Press, 1953), p 186 ("Accordingly, it has been repeatedly held by the [ethics] [c]ommittees that no right to a division arises from the mere recommendation."); Richardson, *Division of Fees Between Attorneys*, 3 J Legal Prof 179, 185-186 (1978) (noting that a few earlier ethics committee decisions allowed fee division based on a mere referral if the client consented but that the committee decisions eventually settled on a "stricter interpretation," which became "the overwhelming view of bar associations," prohibiting fees in these circumstances).

[15] *Opinions of the Committee on Professional and Judicial Ethics*, *Opinion 24* (issued August 1937), 38 Mich St B J 31, 45 (1959) (citation omitted).

[16] See *In re Mardigian Estate*, 502 Mich 154, 189-191; 917 NW2d 325 (2018) (MCCORMACK, J., for reversal) (discussing the history of the ABA standards); see also *Report of the Special Committee on Evaluation of Ethical Standards*, 94 Annu Rep ABA 728, 730 (1969) ("The present Canons . . . are not cast in language designed for disciplinary enforcement and many abound with quaint expressions of the past.").

[17] See Comment, *Ohio Disciplinary Rule 2-107: A Practical Solution to the Referral Fee Dilemma*, 61 U Cin L Rev 239, 241-242 (1992); Zeligson, *The Referral Fee and the ABA Model Rules of Professional Conduct: Should States Adopt Model Rule 1.5(e)?*, 15 Fordham Urb L J 801, 805-806 (1987).

9

fleshed out by more specific Ethical Considerations, and given teeth by mandatory Disciplinary Rules.[18] Disciplinary Rule (DR) 2-107 provided:

> (A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:

> (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

> (2) The division is made in proportion to the services performed and responsibility assumed by each.

> (3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.[19]

Our Court adopted this rule in 1971.[20] The key requirement continued to be the division of the fee based on services provided and responsibility assumed by each lawyer. Unlike Canon 34's use of the disjunctive "or"—service *or* responsibility—DR 2-107 required both services and responsibility to be shared, further cementing the need for the referring attorney to participate in the legal representation of the client. Courts, ethics committees, and commentators interpreted this services-and-responsibility requirement to "relate to an actual participation in or handling of the case," such that "the responsibility

---

[18] ABA, *ABA Model Code Of Professional Responsibility*, Preliminary Statement (1969).

[19] *Id*. at DR 2-107. The Code also contained an Ethical Consideration that essentially repeated the DR. See *Id*. at EC 2-22 ("Without the consent of his client, a lawyer should not associate in a particular matter [with] another lawyer outside firm. A fee may properly be divided between lawyers properly associated if the division is in proportion to the services performed and the responsibility assumed by each lawyer and if the total fee is reasonable.").

[20] *Code of Professional Responsibility*, 53 Mich St B J 18r, 21r (1974).

10

called for under the rule must be related to the legal services rendered *in the actual handling of the* case."[21]  As our ethics committee stated, "Where an attorney or law firm merely performs a referral function, rendering no other services to the client and assuming no responsibility in the matter, a division of fees is improper."[22]

---

[21] *Palmer v Breyfogle*, 217 Kan 128, 144; 535 P2d 955 (1975) (quotation marks and citation omitted), overruled after the state adopted a new rule on referral fees by *Ryder v Farmland Mut Ins Co*, 248 Kan 352; 807 P2d 109 (1991),citing *McFarland v George*, 316 SW2d 662, 670 (Mo App, 1958) ("To merely recommend another lawyer or to refer a case to another lawyer and to do nothing further in the handling of the case cannot be construed as performing service or discharging responsibility in the case.").  See also 1 Rossi, Attorney's Fees (3d ed), § 4:2 (noting that "many courts" under the DR and the canon have held unenforceable referral-fee agreements under which "an attorney merely refers a case to another lawyer and contributes no further effort to the handling of the case and assumes no responsibility for it"); Note, *Money for Nothing?  Have the New Michigan Rules of Professional Conduct Gone too Far in Liberalizing the Rules Governing Attorney's Referral Fees?*, 68 U Det L Rev 229, 232 (1991) ("Cases have 'consistently held that "services performed" requires, at a minimum, that the forwarding lawyer must do more than simply originate the matter and perhaps vaguely consult with the client for client relations purposes thereafter.' "), quoting Wolfram, Modern Legal Ethics (1986), p 512; *Division of Fees*, 3 J Legal Prof at 186 ("[T]he ABA [Ethics] Committee decided that in merely recommending a lawyer to one's client, the recommending attorney performs no service within the meaning of DR 2-107."); Senter, *On Grievances*, 51 Mich St B J 309, 310 (1972) (discussing Michigan's DR 2-107 and noting that "[w]ith respect to so called 'forwarding fees' there can be no proper sharing of a fee for merely bringing about the employment of another lawyer, and where the referring lawyer renders no service and assumes no responsibility"); cf. *Legal Ethics*, p 186 (discussing Canon 34's similar language and stating that "[t]he service and responsibility must, to be effective, relate to the handling of the case").

[22] State Bar of Michigan Ethics Op CI-893 (March 12, 1983).

11

Empirical and anecdotal evidence suggested that DR 2-107 was not popular and was often disregarded.[23] Perhaps acknowledging this reality, the ABA liberalized its standards in the current Model Rule 1.5(e), adopted in 1983:

A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable.[24]

---

[23] See *Division of Fees*, 3 J Legal Prof at 188-190; *Ohio Disciplinary Rule 2-107*, 61 U Cin L Rev at 244-245.

[24] The most recent Restatement has retained the requirements from the ABA:

A division of fees between lawyers who are not in the same firm may be made only if:

(1) (a) the division is in proportion to the services performed by each lawyer or (b) by agreement with the client, the lawyers assume joint responsibility for the representation;

(2) the client is informed of and does not object to the fact of division, the terms of the division, and the participation of the lawyers involved; and

(3) the total fee is reasonable. [1 Restatement Law Governing Lawyers, 3d, § 47, p 332.]

Like Canon 34—but unlike DR 2-107—Model Rule 1.5(e) allows fee-splitting when each lawyer either performs services or assumes responsibility.[25] The ABA has provided a more concrete metric to measure responsibility, holding in ethics opinions that it requires the referring attorney to assume the same level of responsibility as would a " 'partner in a law firm under similar circumstances.' "[26] Either way—whether services were performed or responsibility assumed—the referring attorney must play some role in his or her professional capacity. Still, the possibility exists that the referring attorney might end up doing little more than referring the client, never needing to engage in actual representation, but nonetheless bearing professional responsibility for legal services provided to the client.[27]

---

[25] Franck, *The New Michigan Rules of Professional Conduct*, 67 Mich B J 954, 955 (1988) (noting the similarity between Canon 34 and Model Rule 1.5(e) and that, coming after the DR, the model rule "enlarged the opportunity for the referring lawyer to earn a fee").

[26] *Ohio Disciplinary Rule 2-107*, 61 U Cin L Rev at 247, quoting ABA Informal Op 85-1514 (April 27, 1985).

[27] *Money for Nothing?*, 68 U Det L Rev at 233 & n 27; see also Rossi, § 4:2 ("On its face, [Model Rule 1.5(e)] does not authorize pure referral fees, although it clearly allows more leeway in referral arrangements than did DR 2-107(A)."); *The Referral Fee and the ABA Model Rules of Professional Conduct: Should States Adopt Model Rule 1.5(e)?*, 15 Fordham Urb L J at 815 ("Under Model Rule 1.5(e), a referring lawyer doing absolutely no work could still be 'responsible' for the case as if he had done the work himself, *if* he had potential legal liability for everything, including the possibility of becoming a defendant in a malpractice action when the performing attorney has been negligent."). As the Restatement explains, the rationale for allowing these agreements is that each lawyer could be liable in a malpractice suit to the same extent as a partner in a law firm, and thus, the "assumption of responsibility discourages lawyers from referring clients to careless lawyers in return for a large share of the fee." Restatement, § 47, comment *d*, p 333.

Shortly after the ABA promulgated its new rule, we began the process of amending ours. Although we considered the ABA's model rule, we ultimately rejected it in favor of our present rule.[28] The key difference between this new rule and both its predecessor and the ABA model rule is that it completely discards the services-and-responsibility requirement.

This narrative of MRPC 1.5(e)'s textual development helps illuminate the answer to the question in this case: when attorneys seek to split a fee on the basis of a referral agreement, must the referring attorney have an attorney-client relationship with the client? The answer was abundantly clear under our previous rules. Fee sharing was prohibited unless the referrer provided legal services in the case or assumed responsibility for the representation or, under DR 2-107, did both. By eliminating the services-or-responsibility requirement in 1988, we ended the mandate that the referring lawyer had to continue on in the underlying legal matter by either working on it or assuming liability for it. In doing so, we opened the door to pure referral fees.

But it would be a much greater break with the past to conclude that the 1988 amendment, by eliminating the services-and-responsibility requirement, also eliminated the requirement that the referring attorney contact or consult with or even know the client. In advocating for this interpretation, Sherbow overlooks the language that remains in the text and the relevant context in which that language appears. To be sure, MRPC 1.5(e) does not expressly articulate a requirement that the client have a professional relationship

---

[28] See *Proposed Michigan Rules of Professional Conduct*, 64 Mich B J 775 (1985) (publishing the ABA model rule for comment); *Money for Nothing?*, 68 U Det L Rev at 242 (discussing the adoption process).

with the referring attorney. That requirement, however, is evident when the rule's terms are read in their proper context.

## 2. TEXT AND CONTEXT

Two other ethical rules provide necessary context that helps to situate our analysis of MRPC 1.5(e)'s text. The first is MRPC 7.2. With a few exceptions not relevant here, the rule bans lawyers from "giv[ing] anything of value to a person for recommending the lawyer's services[.]"[29] Against this background prohibition on paid referrals, MRPC 1.5(e) functions as an exception under which lawyers (but not nonlawyers) can be paid for recommending another's services.[30] It would be strange, to say the least, if this exception allowed lawyers to be paid for referrals "simply because lawyers possess a license" to practice law, i.e., simply because they are a member of the legal profession.[31] Rather, the license can be relevant only because it gives the lawyer authority and expertise to exercise professional judgment. In a like manner, the second relevant ethical rule, MRPC 5.4, prohibits attorneys from sharing legal fees with nonlawyers except under certain circumstances not at issue here. An attorney can therefore share in another's fees only by virtue of being an attorney. Both rules thus indicate that MRPC 1.5(e) operates as an exception based solely on an individual's status as a lawyer. This suggests that MRPC

---

[29] MRPC 7.2(c) (excepting advertising payments, nonprofit referral services, and the purchase of a law practice).

[30] See Connecticut Bar Association Informal Ethics Op 2013-04 (May 15, 2013), p 2.

[31] *Id*.

1.5(e) requires the referring lawyer to put his or her law license to use, in some manner, on behalf of the client.[32]

It is therefore no surprise to see that MRPC 1.5(e) adverts to the referring lawyer's "participation," of which the "client" must be informed and to which the client must not object. The word "participation" contemplates something more than the referring attorney's bare participation as a party to the fee agreement. Otherwise, MRPC 1.5(e)'s requirements will have been reduced nearly to nothing. For example, the referring attorney could hear about potential litigation involving strangers and call a friend at another law firm to tip him or her off about the possible case. In those circumstances, as long as the client was told about the referring lawyer's participation and the client did not object, MRPC 1.5(e) would be satisfied. The rule would thus boil down to a requirement that someone tell the client that an unknown lawyer was to receive part of the fee despite having done no legal work on the case and having no actual connection to or contact with the client.

The text indicates that the minimum required "participation" is the establishment of an attorney-client relationship. The rule speaks of the "division of a fee between *lawyers* . . . ."[33] The effect of this language is to require the referring lawyer to participate as a lawyer. Our State Bar's ethics committee has recognized as much, noting that a

---

[32] The Connecticut Professional Ethics Committee reached the same conclusion, reasoning that the "referral fees are permitted to be paid to lawyers because the referring lawyer has a lawyer-client relationship and because the referring lawyer owes the client the duties prescribed by the Rules of Professional Conduct." *Id.*

[33] MRPC 1.5(e) (emphasis added).

16

contractual relationship that results in the sharing of attorney fees between lawyers "does not fall within MRPC 1.5(e)" when one lawyer "is not participating in the transaction *as a lawyer*."[34] In the transaction before the committee, for example, one lawyer rented office space to another, with part of the rent calculated on the basis of the renter's gross income.[35] As the committee pointed out, however, MRPC 5.4 prohibits the sharing of attorney fees with nonlawyers except under limited circumstances.[36] Thus, a lawyer who does not participate as a lawyer—or who, for some reason, is not eligible to practice—would be barred from sharing fees.[37] The only reason, then, that a lawyer can share in fees is because, as the text of MRPC 1.5(e) suggests, he or she participates in the matter as a lawyer.

Also relevant is the rule's use of the word "client": the fee is permissible if, among other things, "the client is advised of and does not object to the participation of all the lawyers involved[.]" MRPC 1.5(e). At the time we adopted the rule in 1988, "client" was defined as "[a] person who employs or retains an attorney, or counsellor, to appear for him in courts, advise, assist, and defend him in legal proceedings, and to act for him in any legal

---

[34] State Bar of Michigan Ethics Op RI-133 (May 28, 1992).

[35] *Id*.

[36] *Id*.; see MRPC 5.4. In the ethics opinion, the committee ultimately concluded on other grounds that the rent did not constitute fee-splitting. Ethics Op RI-133.

[37] *Id*.; cf. *Morris & Doherty, PC v Lockwood*, 259 Mich App 38; 672 NW2d 884 (2003) (holding that an inactive member of the bar was ineligible to share fees as a lawyer under MRPC 1.5(e)).

17

business."[38] Thus, to be a "client" of an attorney, one must have a professional relationship with the attorney. The comments to MRPC 1.5 provide some additional support for the conclusion that the referring lawyer must participate as a lawyer and thereby establish a professional relationship with the "client."[39] As the comment explains, the divided fee still constitutes "a single billing to a client . . . ."[40] The fee division "facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring lawyer and a trial specialist."[41] In other words, the comment characterizes a fee-splitting arrangement as an "association" of lawyers—including those who simply make referrals— for the benefit of the joint client, who is given one bill for the association's efforts.[42]

---

[38] *Black's Law Dictionary* (6th ed). The lay dictionary provides a similar definition. See *Webster's Basic English Dictionary* (1995) ("[A] person who uses the professional advice or services of another.").

[39] "We acknowledge that staff comments to the court rules are not binding authority, but they can be persuasive in understanding the proper scope or interpretation of a rule or its terms." *People v Comer*, 500 Mich 278, 298 n 48; 901 NW2d 553 (2017).

[40] MRPC 1.5, comment.

[41] *Id*.

[42] Sherbow contends that the term "client" could refer to the relationship between the litigant and the attorney to whom he or she is referred and who handles the litigant's case. At least one court, in a brief analysis, has agreed when interpreting a similar rule. See *Ryder*, 248 Kan at 363 ("The word 'client' could refer either to the status of a litigant with regard to the referring attorney or with regard to the attorney to whom the matter is referred. If it refers to the relationship with regard to the referring attorney, the rule mandates an attorney-client relationship with the referring attorney. It is clear that the litigant would be a client of the attorney to whom the matter is referred. We adopt what we believe to be the logical interpretation, that 'client' refers to the status of the litigant with the attorney to whom the matter is referred."). Nonetheless, it does not follow that simply because the

18

The surrounding rules also support our conclusion. One of the central ethical precepts in our profession is that lawyers with direct conflicts cannot represent a client unless the lawyer reasonably believes the conflict will not adversely affect the relationship and the client consents. We have codified this rule in MRPC 1.7.[43] If no professional relationship were required under MRPC 1.5(e), then MRPC 1.7 would not apply. As a result, a referring attorney who could not ethically represent a client could nonetheless guide that client to an attorney and, in the process, collect a fee. Interpreting MRPC 1.5(e)

---

word client *could* refer to the relationship with the attorney to whom the case is referred, the word *must* refer to that attorney alone. It is perfectly consistent with the text for "client" to refer to the relationship the individual must have with both lawyers. And in light of the rule's comments, this interpretation of "client" is on sounder ground.

[43] The rule states:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

> (2) each client consents after consultation.

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

> (1) the lawyer reasonably believes the representation will not be adversely affected; and

> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved. [MRPC 1.7.]

19

in this manner would thus conflict with the important client protections offered by MRPC 1.7.

Addressing this issue, our Court of Appeals and our ethics committee have recognized that

> "[i]f the referring lawyer has a conflict, then any advice might smack of a conflict, even if the advice is to go to a specific lawyer. If the conflict arises because the lawyer has a current client with interests directly adverse to those of the prospective client, MRPC 1.7(a), any advice regarding choice of counsel would be inappropriate, and akin to selecting one's adversary."[44]

Although neither the ethics opinion nor the Court of Appeals expressly analyzed whether MRPC 1.5(e) requires an attorney-client relationship, they concluded that the referring attorney had a fiduciary relationship with the client, which is the essence of the attorney-client relationship.[45] They stated, " 'When lawyers split fees, both remain in a fiduciary relationship with the client.' "[46] Other courts and ethics bodies, analyzing rules that similarly lack the services-or-responsibility requirement, have agreed.[47] To hold otherwise would undercut the protections offered by MRPC 1.7.

---

[44] *Evans & Luptak, PLC v Lizza*, 251 Mich App 187, 201-202; 650 NW2d 364 (2002), quoting State Bar of Michigan Ethics Op RI-116 (February 19, 1992).

[45] *Evans & Luptak*, 251 Mich App at 201-202, quoting Ethics Op RI-116. See *Rippey v Wilson*, 280 Mich 233, 243; 273 NW 552 (1937) ("The relationship between client and attorney is a fiduciary one, not measured by the rule of dealing at arm's length.").

[46] *Evans & Luptak*, 251 Mich App at 202, quoting Ethics Op RI-116.

[47] The Connecticut Professional Ethics Committee, for example, examined a rule identical to ours in all relevant respects and concluded "that Rule 1.5(e) by necessary implication requires that each lawyer receiving a fee from the representation of a client establish a lawyer-client relationship with the client . . . ." Informal Ethics Op 2013-04, pp 1-2 & 2 n 2, citing, among other things, *Evans & Luptak*, 251 Mich App 187, and Ethics Op RI-

20

The efficacy of our confidentiality rules would similarly be sapped if we interpreted MRPC 1.5(e) not to mandate any direct or indirect contact or consultation between the referring attorney and client. MRPC 1.6(a) requires lawyers not to reveal confidences and secrets learned in the "professional relationship" with the client. Similar protections apply to information learned from prospective clients—those who "consult[] with a lawyer about

116. Maine's ethics body concluded likewise, determining that a similarly phrased rule "contemplates both lawyers being employed in some sense by the client, even if the referring lawyer does not expect to spend time proportional to her fee, or any time for that matter, or expect to be consulted about the litigation after her referral." Maine Board of Bar Overseers Op 145 (September 27, 1994) (examining a rule that stated, in relevant part, that the " 'client . . . consents to employment of the other lawyer' ") (citation omitted). A Massachusetts trial court reached the same result because, in part, a "client" could never consent to the employment of the nonreferring attorney given that "the 'client' can never actually be a client [of the referring attorney] because of a conflict of interest. . . . Theoretically the attorney-client relationship has never been established." *Bloomenthal v Halstrom*, unpublished opinion of the Massachusetts Superior Court, issued March 16, 1999 (Docket No. 951773B), p 5.

A few courts and ethics committees have reached the opposite conclusion. Respectfully, we do not find these cases persuasive. The only court to squarely address whether a rule like ours requires an attorney-client relationship was the Kansas Supreme Court. But its analysis rested on the mere fact that the term "client" does not necessarily relate to a relationship with the referring attorney. See *Ryder*, 248 Kan at 363. For the reasons stated, we do not believe this carries the day. Other courts opining on this topic have failed to directly resolve it. See *Naughton v Pfaff*, 2016 IL App (2d) 150360, ¶ 60; 57 NE3d 503 (2016) (noting a similar version of the rule and stating, "[The term] 'client' can be understood to mean the individual who becomes the client of the receiving lawyer," and "[w]hile there might be unexplored public-policy reasons for requiring that an attorney first have an attorney-client relationship with an individual *before* a referral, such a result is not mandated by the rule's language itself") (emphasis added); *Law Offices of Robert L Crill, Inc v Bond*, 76 SW3d 411, 420-421 (Tex Civ App, 2001) (holding that no professional relationship with the client was required when the parties failed to adequately brief the issue and, in any event, the evidence was sufficient to allow the fact-finder to infer that an attorney-client relationship did, in fact, exist).

21

the possibility of forming a client-lawyer relationship with respect to a matter . . . ."[48]  But if no attorney-client relationship forms and if the "referring" attorney never even consults with the individual, then it is hard to see how the "referring" attorney would have any obligations with regard to otherwise confidential information he has learned.  And it is very possible that he or she could be exposed to such information.  Consider in this case, for example, that Sherbow, the referring attorney, discussed the case with at least one client and the receiving attorney.  He very well could have learned information that he could not disclose if he were considered to have an attorney-client relationship or even if the individuals had been mere prospective clients.  Yet without such a connection to the individual, it would seem that the referring attorney would be free to broadcast otherwise confidential information at will.

In light of these considerations, we cannot agree with Sherbow that MRPC 1.5(e) is properly interpreted as permitting a referring attorney to enter into an agreement to divide a fee for a client with whom he or she has no professional relationship.  And because MRPC 1.5(e) indicates that he or she must participate as a lawyer when the basis of the fee division is a referral, the lawyer must exercise some professional judgment in actually referring the case to an attorney.  To hold otherwise would, as already noted, take this rule beyond not only what the text and context suggest but also what the history of the rule indicates was its meaning.

---

[48] MRPC 1.18(a).  See also MRPC 1.18(b).

22

## 3. THE REQUIRED RELATIONSHIP

This does not mean, however, that the referring attorney must provide legal services for the client beyond the referral or assume responsibility for the client's case. Instead, the rule merely requires that the lawyer participate as a lawyer, which requires the establishment of a professional relationship with the client. This is an agency relationship that arises from the agreement of the parties, which can be express or implied through their conduct.[49] Although a consultation between the lawyer and client is not enough, by itself, to create the relationship, some direct or indirect consultation between the parties is necessary.[50] This is not a radical concept or requirement but a pure fact of life for consumers of goods and services. Unless the consumer, say, places an order in the fast-food drive thru or sends someone else to do so on his or her behalf, he or she will not be getting the takeout meal. In the same manner, no attorney-client relationship can exist

---

[49] See *Macomb Co Taxpayers Ass'n v L'Anse Creuse Pub Sch*, 455 Mich 1, 11; 564 NW2d 457 (1997).

[50] See *McCabe v Arcidy*, 138 NH 20, 25; 635 A2d 446 (1993) ("Consultation between an attorney and another person constitutes the fundamental basis of an attorney-client relationship. A critical element of that consultation, however, is that the person initiating it do so with the intent of seeking legal advice from the attorney."); 1 Mallen, Legal Malpractice (2020), § 8:12 (noting the consultation requirement); 48 Am Jur, Existence of Attorney-Client Relationship, Proof of Facts 2d 525 (Nov 2020 update), § 8 ("Although a consultation directly or indirectly involving an attorney and another person constitutes the very basis of an attorney-client relationship, the fact of such a consultation is never enough, by itself, to give rise to the relationship."); cf. *Macomb Co Taxpayers*, 455 Mich at 11 ("The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession.") (quotation marks and citation omitted).

unless the client seeks to obtain legal advice or services from an attorney either directly or through an intermediary.

Consequently, MRPC 1.5(e) requires the attorney to participate as an attorney, which in turn requires him or her to establish a professional relationship with the client, which can be accomplished by a direct or indirect (i.e., through the client's agent) consultation. There is, however, no rule that the relationship thus formed must extend for any particular duration or seek any particular objectives (as opposed to being on a general retainer). As noted, the attorney-client relationship depends on the agreement of the parties and "is one of agency."[51] "An attorney at law," we have explained, "need not be in court or preparing to go into court, to be engaged in work as an attorney. In a legal sense, an attorney at law often acts as an agent or representative."[52] In that role, the attorney's scope of authority is defined by what the parties have expressly or impliedly agreed to.[53] The

---

[51] *Fletcher v Bd of Ed of Sch Dist Fractional No 5*, 323 Mich 343, 348; 35 NW2d 177 (1948) (quotation marks and citation omitted); *id.* ("The employment of counsel does not differ in its incidents, or in the rules which govern it, from the employment of an agent in any other capacity or business.") (quotation marks and citation omitted).

[52] *Id.*

[53] See *Wigfall v Detroit*, 504 Mich 330, 340-342; 934 NW2d 760 (2019) (explaining that the agent can act in matters that the client has entrusted to the agent); see also *Uniprop, Inc v Morganroth*, 260 Mich App 442, 447; 678 NW2d 638 (2004) ("[A]n attorney often acts as his client's agent, and his authority may be governed by what he is expressly authorized to do as well as by his implied authority."). Of course, any limitations must be consistent with the lawyer's ethical duties. But we are aware of no such duty that would prevent the attorney from restricting his professional services to the referral.

parties thus can determine the precise scope and nature of the relationship.[54]  In addition, a recent amendment to our rules allows parties to control the extent of the attorney-client relationship even in areas where limitations were not traditionally allowed.[55]  For example, when an attorney represents a client in court, the attorney and client can agree to limit the scope of their relationship in compliance with MRPC 1.2.

Thus, when the consultation or contact leads to or is for the purpose of a referral to another lawyer, the entire attorney-client relationship can begin and end with the consultation and referral itself, provided that the parties have expressly or impliedly demonstrated their intent to enter into such a relationship.[56]  In these circumstances, the

---

[54] Cf. Day, *New Limited Scope Rules Benefit Underemployed Attorneys and Overburdened Courts*, 97 Mich B J 44, 44 (2018) (noting that attorneys have traditionally provided limited-scope services such as "the commercial or real estate attorney hired to review a single contract with no expectation of further engagement in the transaction, or the traditional litigator who provides an initial case assessment and consultation for a flat fee to a potential civil plaintiff or an appellant in a criminal matter"); Vauter, *Unbundling: Filling the Gap*, 79 Mich B J 1688, 1689 (2000) ("[A]ttorney-client relationships are ordinarily based on contract, and . . . parties may thus mutually agree to limit the scope of representation. . . .  Providing limited advice and counsel is not new to the practice of law.") (paragraph structure omitted).

[55] See MRPC 1.2(b) (allowing an attorney and client to "limit the scope of a representation . . . if the limitation is reasonable under the circumstances and the client gives informed consent").

[56] See *Macomb Co Taxpayers Ass'n*, 455 Mich at 11; see also Restatement, § 14, comments *c* and *e*, pp 126-128 (explaining that the client's intent to enter into a relationship can be inferred from the circumstances and that the attorney's assent to the relationship likewise can arise in various ways); 23 Williston, Contracts (4th ed), § 62:3, p 302 (noting that when determining whether a relationship has formed, "the majority of courts focus on whether it has been sufficiently established that the advice or assistance of the attorney in legal matters has been both sought and received").

referring attorney is under no obligation to do anything other than refer the client to another attorney and comply with the other requirements in MRPC 1.5(e) if the fee is to be split. The referral itself constitutes valuable advice. It takes "both time and attention to evaluat[e] the abilities and qualifications of these specialists [i.e., the attorneys to whom the case is referred] so that he can refer clients to exactly the right lawyer."[57]

In requiring that this advice be given to meet the requirements of MRPC 1.5(e) when the basis for a fee division is a referral, we are not altering how referrals are traditionally handled in this state. As amicus Ethics Practitioners and Educators explained in this Court, the referral is simply a "communication that establishes a form of an attorney-client relationship," but "[n]o particular form of interaction is required" and "no *ongoing* attorney-client relationship results from this communication . . . ." Amicus observes that if this limited attorney-client relationship is found to be required by MRPC 1.5(e), then the only practical change from current practices prevalent in the profession is the possibility that the referring attorney will document the referral.[58]

At bottom, our holding today rests on a simple proposition: attorneys cannot obtain referral fees under MRPC 1.5(e) without entering into an attorney-client relationship with

---

[57] *Watson v Pietranton*, 178 W Va 799, 804; 364 SE2d 812 (1987) (Neely, J., concurring).

[58] As noted, the existence of the professional relationship also brings into play attendant ethical duties. We need not decide how those duties apply in these circumstances because that question has not been raised. Nor do we here decide whether our holding today gives rise to an action against referring attorneys for negligent referrals. Cf. *Estate Of Carpenter v Weiner & Assoc, PLLC*, unpublished per curiam opinion of the Court of Appeals, issued Oct 31, 2017 (Docket No. 332142), p 7 ("Michigan has not recognized a cause of action for negligent professional referral by an attorney.").

the individual being referred. If the parties intend to enter a professional relationship, the referral can form the basis for that relationship, which does not need to extend any further than the referral.[59]

The trial court's instruction that a professional relationship is required was therefore correct. In addition, we find no error in the trial court's definition of "client" in the jury instructions because it accurately required that a client employ a lawyer for professional advice or help.

## B. THE BURDEN OF PROOF

The question that follows from our holding above is which side bears the burden of proving compliance with (or violation of) MRPC 1.5(e). In this case, defendant Fieger Firm raised the issue of a violation of MRPC 1.5(e) as a defense to plaintiff Sherbow's attempt to enforce the referral-fee contract. Specifically, the Fieger Firm argues that because contracts that violate public policy are unenforceable, and because MRPC 1.5(e) represents public policy, it follows that Sherbow's violation of MRPC 1.5(e) renders his referral-fee agreement unenforceable.[60] As noted, the trial court instructed the jury that

---

[59] To be clear, our holding pertains to situations in which the referring attorney seeks a share of the attorney fees under MRPC 1.5(e). We do not address the abstract question of whether a referral can, by itself, establish an attorney-client relationship. The attorney-client relationship generally is a "consensual one," Restatement, § 14, comment *b*, p 126, and thus, when no express contract exists, the circumstances concerning the referral must always be considered to determine whether the parties' intent to enter the relationship can be implied from their conduct; cf. *id.* at comment *c*, pp 126-127 (noting that the context in which the advice is given is a relevant factor).

[60] See generally *Evans & Luptak*, 251 Mich App at 196 ("We hold that the alleged contract is unethical because it violates the Michigan Rules of Professional Conduct (MRPC). Furthermore, we hold that unethical contracts violate our public policy and therefore are

27

Sherbow had the burden of proving by a preponderance of the evidence that he had an attorney-client relationship with each of the clients, i.e., Rice's estate, Mervie, Dixon, and Hill.

We agree with the Court of Appeals' well-reasoned analysis that the trial court's instruction regarding the burden was erroneous. We have explained that the "burden of proof," in a strict sense, "refers to the necessity or duty of affirmatively proving a fact or facts in dispute on an issue raised between the parties in a case."[61] Under this sense of the phrase, plaintiffs will bear the ultimate burden of persuading the jury of the elements of their case.[62] This means that plaintiffs have to establish what is known as their "prima facie case" by producing sufficient evidence for each of the elements of their legal claim that the fact-finder can "infer the fact at issue and rule in the party's favor."[63] Here, for instance, Sherbow seeks to enforce a contract, and he must therefore prove a valid contract

---

unenforceable."). The parties do not dispute that a referral contract in violation of MRPC 1.5(e) could be void as against public policy. Accordingly, we do not address this question but assume, for purposes of this opinion, that violations of MRPC 1.5(e) can render the contract void on these grounds.

[61] *Palenkas v Beaumont Hosp*, 432 Mich 527, 550; 443 NW2d 354 (1989) (opinion by ARCHER, J.). Although Justice ARCHER's opinion was not joined by the other members of the Court, the other members of the Court concurred in this portion of his opinion. *Id*. at 530 (opinion of the Court).

[62] *Id*.

[63] *Black's Law Dictionary* (11th ed) (defining "prima facie case").

exists.[64]  To do so, he bears the burden of establishing, among other things, that the contract has "a proper subject matter."[65]

The "burden of proof" is also sometimes used to "denote[] the burden of going forward, i.e., the obligation to respond to a prima facie case established by the opposing party."[66]  In this sense of the phrase, the defendant will bear the "initial burden of production on [their] affirmative defense," after which the burden of production shifts to the plaintiff to bring forth enough evidence to overcome the defendants' evidence.[67]  An affirmative defense is one that does not challenge the "the merits of the plaintiff's claim"; that is, it "seeks to foreclose the plaintiff from continuing a civil action for reasons unrelated to the plaintiff's prima facie case."[68]

To summarize, a plaintiff carries the ultimate burden of persuasion and must prove the elements of his or her claim, but a defendant carries the burden of production on an

---

[64] See *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 101; 878 NW2d 816 (2016) (describing the elements of a contract claim).

[65] *AFT Mich v Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015).

[66] *Palenkas*, 432 Mich at 550 (opinion by ARCHER, J.); see also *Black's Law Dictionary* (11th ed) ("Burden of proof" means "[a] party's duty to prove a disputed assertion or charge; a proposition regarding which of two contending litigants loses when there is no evidence on a question or when the answer is simply too difficult to find.  The burden of proof includes both the *burden of persuasion* and the *burden of production*.").

[67] *Palenkas*, 432 Mich at 550 (opinion by ARCHER, J.).

[68] *Campbell v St John Hosp*, 434 Mich 608, 615-616; 455 NW2d 695 (1990); see also *Chmielewski v Xermac, Inc*, 457 Mich 593, 617; 580 NW2d 817 (1998) ("An affirmative defense is a defense that does not controvert the establishment of a prima facie case, but that otherwise denies relief to the plaintiff.") (quotation marks and citation omitted).

affirmative defense.  Once the defendant comes forward with evidence for such a defense, then the plaintiff must produce evidence in response.  Thus, in this case, the question comes down to what type of defense has the Fieger Firm raised: does it negate Sherbow's prima facie case, for which Sherbow, as the plaintiff, bears the burden of proof, or is it an affirmative defense, for which the Fieger Firm bears the initial burden of producing evidence?  The Fieger Firm contends that the violation of MRPC 1.5(e) negates the prima facie element of Sherbow's claim that the fee agreement relates to a proper subject matter.  The Fieger Firm asserts that the violation of MRPC 1.5(e) resulting from the lack of attorney-client relationships renders improper the subject matter of the agreement.

We disagree.  Referral agreements are a proper subject matter for contracts—that much is shown by the existence of MRPC 1.5(e), which authorizes contracts on this subject.  Accordingly, the subject matter of the contract is not illegal or improper; it is not, for example a contract for murder.  Rather, what renders this particular contract challengeable as void is not its subject but the allegation that one of the parties to the contract, Sherbow, did not have an attorney-client relationship with each client.  The Fieger Firm's argument therefore is not that a referral agreement is generally inappropriate but that, under the facts here, this specific agreement is void.  That does not amount to a defense negating the prima facie element of a "proper subject matter."[69]

Instead, the Fieger Firm's contention is that an otherwise valid contract is, in these circumstances, void because it violates the public policy inherent in MRPC 1.5(e).  Our court rules indicate that this public-policy argument constitutes an affirmative defense.

---

[69] *AFT Mich*, 497 Mich at 235.

MCR 2.111(F)(3)(a) and (b) list examples of affirmative defenses, which include arguments "that an instrument or transaction is void, voidable, or cannot be recovered on by reason of statute or nondelivery" or "that by reason of other affirmative matter seeks to avoid the legal effect of or defeat the claim of the opposing party, in whole or in part[.]" The Fieger Firm's argument fits these descriptions. It does not attack Sherbow's prima facie case but, instead, offers an independent reason why the referral agreement is void and the contract claim should be defeated.[70]

Consequently, we hold that the Fieger Firm's argument challenging the referral agreement as void as against public policy constitutes an affirmative defense for which the Fieger Firm, as defendant, bears the burden of proof. The trial court's instruction that Sherbow, as plaintiff, bore the burden of proof on this point was erroneous.

---

[70] It is worth noting that we have likewise characterized a public-policy defense to a contract as an affirmative defense, as have other courts. See *Sands Appliance Servs, Inc v Wilson*, 463 Mich 231, 239; 615 NW2d 241 (2000) (finding that justice required allowing the defendant to amend its pleadings to add an affirmative defense that a contract was void as against public policy); *Gibson v Martin*, 308 Mich 178, 180; 13 NW2d 252 (1944) (addressing the argument that "the failure of defendant to plead the illegality of the contract as an affirmative defense precludes him from relying on [it] . . . in order to void the contract"); *Mahoney v Lincoln Brick Co*, 304 Mich 694, 695-696; 8 NW2d 883 (1943) ("As an affirmative defense, defendant claimed that its contract arrangement with plaintiff was void and unenforceable because [it was] against public policy."). See also *Honey Dew Assoc, Inc v M & K Food Corp*, 241 F3d 23, 27 (CA 1, 2001) ("[W]e find cases stating that defendants who challenged contract enforcement on the basis of illegality or a violation of public policy have the burden to raise and prove that defense. . . . We also find a . . . case which assigns the burden of demonstrating unenforceability to the party hoping to avoid enforcement of the contract.").

31

## C. ERROR REQUIRING REVERSAL

The final issue we must address is whether, in light of our holdings, the trial court committed error that would require us to vacate the jury verdict and remand for retrial. Recall that the Court of Appeals found two errors in the jury instructions and concluded that those errors required retrial. First, as noted, the Court determined that MRPC 1.5(e) does not require an attorney-client relationship with the referring attorney. Therefore, the jury instructions and verdict form requiring proof of that relationship were in error, according to the Court of Appeals. And because the error affected the outcome of the case—the jury found no attorney-client relationship between Sherbow and three of the clients, Mervie, Hill, and Dixon, thereby precluding Sherbow from recovering with regard to those clients—the Court concluded that the error required a new trial. But given our holding that an attorney-client relationship is required, the trial court did not err by instructing the jury that such a relationship needed to be established for Sherbow to prevail. Therefore, there is no basis for a new trial on this ground.

The second error discerned by the Court of Appeals, with which we agree, is the trial court's instruction that Sherbow bore the burden of proving the professional relationship with the clients. It is not clear whether the Court of Appeals would have concluded that this error, by itself, required retrial. Nonetheless, as a result of our holdings in this opinion, this is the question we must answer here.

MCR 2.613(A) guides our analysis of whether an error below requires us to vacate or modify a judgment:

> An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or

32

for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.[71]

It is no easy matter to determine whether a particular error implicates "justice," which requires courts to undertake the difficult task of discerning whether the error prejudiced the party challenging it.[72]

In the context of instructional errors, we have stated that such an error "warrants reversal if the error 'resulted in such unfair prejudice to the complaining party that the failure to vacate the jury verdict would be "inconsistent with substantial justice." ' "[73] Applying this standard in *Cox v Flint Bd of Hosp Managers*, we addressed an erroneous jury instruction that affected the burden of proof.[74] There, the plaintiff's medical

---

[71] MCR 2.613(A).

[72] See *Solomon v Shuell*, 435 Mich 104, 138; 457 NW2d 669 (1990) (opinion by ARCHER, J.) (applying the harmless-error rule in MCR 2.613(A) and determining that error was inconsistent with substantial justice because it was prejudicial); *O'Donnell v Connecticut Fire Ins Co*, 73 Mich 1, 4; 41 NW 95 (1888) ("The rule that error which does not prejudice should be disregarded means such error as does not prevent a party from obtaining his just rights, and applies in all cases and in all proceedings had before courts; and, while the rule is one of the most wholesome in our system of jurisprudence, its application is not unfrequently fraught with much danger."); cf. *People v Lyles*, 501 Mich 107, 126-127; 905 NW2d 199 (2017) (MCCORMACK, J., dissenting) (discussing harmless error in the analogous criminal context and stating that "[w]e must measure [the jury's] verdict based not on whether we agree with it ourselves, but on whether we can still trust it enough, as a matter of law, to reflect how they would have decided the case had it not been wrongly presented to them").

[73] *Cox*, 467 Mich at 8 (citations omitted).

[74] *Id*. at 9.

malpractice claim against a hospital rested on a vicarious-liability theory.[75] The trial judge instructed the jury that the professional-malpractice standard meant " 'the failure to do something which a hospital neonatal care unit would do or . . . would not do . . . .' "[76] As we pointed out, the neonatal care unit was not an independent actor capable of negligence but, rather, consisted of various individuals; thus, we concluded that "[i]nstructing the jury that it must only find the 'unit' negligent relieves plaintiffs of their burden of proof" because "[s]uch an instruction allows the jury to find defendant vicariously liable without specifying which employee or agent had caused the injury . . . ."[77] This warranted reversal because the instruction "effectively relieved plaintiffs of their burden of proof and was not specific enough to allow the jury to 'decide the case intelligently, fairly, and impartially.' "[78]

It could be argued that the error in the present case is even clearer than it was in *Cox* because here the trial court did not simply state the law at a level of abstraction that had the indirect effect of shifting the burden—the trial court affirmatively placed the burden on the wrong party. But this observation largely goes toward establishing the existence of error itself rather than the effect of that error. When examining how the error might have influenced the outcome, it is clear that Sherbow was not prejudiced as to two of the clients but was prejudiced as to the third.

---

[75] *Id*. at 10-11.

[76] *Id*. at 10.

[77] *Id*. at 12.

[78] *Id*. at 15 (citation omitted).

As a general matter, the parties were able to present, and the jury was able to consider, a substantial amount of evidence specifically detailing Sherbow's relationships with each of the clients. Some of the evidence was common to all three clients. For example, none had a signed agreement with Sherbow, nor did Sherbow present evidence in the proceedings below that he had any agreement with them. Moreover, as can be seen in the facts of this case, Sherbow's initial "referral" of the case came a full day before he talked to any of the clients.

With regard to Mervie, Sherbow admitted at trial that he did not meet her until the July 2012 meeting at the Fieger Firm, during which she signed a retainer agreement arranging for the Fieger Firm to represent her in the underlying case. Although there is some dispute about whether Mervie was informed that Sherbow would receive a referral fee, there was no evidence presented by either side that Sherbow and Mervie had any contact or communication whatsoever, let alone that Sherbow provided professional advice to Mervie that she engage the Fieger Firm to represent her. Indeed, Mervie provided unrebutted testimony that she had never spoken with Sherbow and that Dion—who had talked with Sherbow—had never mentioned Sherbow to her. As to Hill, Sherbow testified at trial that he first met him in a deposition for the current case. No other testimony or evidence was presented by either side that could give rise to an inference that Sherbow had any contact or communication with Hill or that he referred Hill to the Fieger Firm. Nor does any evidence suggest that Sherbow could be deemed to have consulted with Hill through an intermediary, such as Dion. Thus, regardless of the trial court's error in assigning the burden of proof to Sherbow, there was no basis on which a jury could find

35

Sherbow had an attorney-client relationship with Mervie or Hill that involved Sherbow's professional advice that they use the Fieger Firm for their case.

Our conclusion is different with regard to Dixon. As with Mervie and Hill, there is no dispute that Sherbow did not actually speak with Dixon about the case before the "referral" occurred. But that was because Dixon remained in a coma during the relevant period. Sherbow's argument, therefore, is that Dion acted on behalf of Dixon, just as he had acted on behalf of Rice's estate. Consequently, Sherbow concludes, the jury's finding that Dion was Sherbow's client on behalf of the estate also supports a finding that Dion was Sherbow's client on behalf of Dixon. In other words, Sherbow's referral of Dion to the Fieger Firm created a sufficient relationship between Sherbow and both the estate and Dixon.

Unlike with Mervie and Hill, there is evidence that could support such a conclusion. At the July 2012 meeting in the Fieger Firm's office, Dion did agree to the Fieger Firm's representation of Dixon even though she remained in a coma. Moreover, at trial, Dion agreed that when he spoke with Sherbow, he was looking for guidance as it related to his family.[79] Given this evidence and the fact that the jury found that Sherbow's interactions with Dion were enough to create an attorney-client relationship with Rice's estate, we cannot say with any certainty that a jury properly instructed on the burden of proof would find that those same interactions with Dion were insufficient to establish an attorney-client relationship with Dixon. Accordingly, we conclude that the erroneous jury instructions

---

[79] As noted, however, he never discussed Sherbow with Mervie, and there is no evidence he related Sherbow's advice to Hill.

prejudiced Sherbow as it relates to Dixon. A new trial is therefore warranted as to Sherbow's claim regarding a referral fee for Dixon.[80]

## IV. CONCLUSION

We hold that a fee division under MRPC 1.5(e) requires that the participating lawyers establish a professional relationship with the client. Where, as here, one lawyer claims part of the fee on the sole basis of having referred the client to the other lawyer, the referring attorney must actually consult with the client, directly or through an intermediary, in giving the referral. The consultation itself is sufficient to create an attorney-client relationship, if the parties so intend. The burden of proving that MRPC 1.5(e) has been violated and that therefore a referral-fee agreement is unenforceable falls upon the party challenging the agreement, which here is the Fieger Firm. In light of these conclusions, the trial court properly instructed the jury that an attorney-client relationship was required but erred by placing the burden of proof on Sherbow. This error was prejudicial only as it relates to Sherbow's claim that he established a sufficient professional relationship with Dixon through Dion. Therefore, the Court of Appeals' judgment is reversed in part and

---

[80] The Fieger Firm's brief on appeal also requests that we reverse the jury verdict in favor of Sherbow with regard to Rice's estate. Our holdings, however, preclude such relief. Specifically, the jury determined that even with the burden of proof on Sherbow, he demonstrated that he had an attorney-client relationship with the estate through Rice's son, Dion, and that he actually referred the estate to the Fieger Firm. These findings adequately reflect the requirements of MRPC 1.5(e) as we have interpreted them here. The Fieger Firm also contends that reversal of the jury verdict is warranted because the estate's attorney, and not Dion, should be considered the client with respect to the estate. Even assuming that this issue properly falls within any of the specific questions on which we granted leave to appeal, we see no reason to reject the Court of Appeals' determination that the Fieger Firm failed to properly raise it on appeal in that Court.

affirmed in part, the jury's verdict is vacated with respect to Dixon, and the case is remanded to the trial court for a new trial with regard to the portion of the fee Sherbow seeks for referring Dixon.

David F. Viviano
Bridget M. McCormack
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch
